IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FUJITSU LIMITED, LG ELECTRONICS
INC. and U.S. PHILIPS CORPORATION,

                Plaintiffs,

        v.

NETGEAR, INC.,

                Defendant/Counterclaimant.

OPINION AND ORDER

07-cv-710-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiffs Fujitsu Limited, LG Electronics, Inc. and U.S. Philips Corporation are suing defendant NETGEAR, Inc. for allegedly infringing United States Patents Nos. 6,469,993 (the '993 patent); 6,018,642 (the '642 patent); and 4,975,952 (the '952 patent). All three patents address technology involving wireless transmission of information.

It has been plaintiffs' position since the beginning of this lawsuit that devices necessarily practice the inventions in their patents when those devices comply with certain sections of the Institute for Electrical and Electronics Engineers' 802.11 Standard-2007, which provides requirements regarding methods for the wireless connection and communication of devices in a local area network, or the Wi-Fi Multimedia Specification,

1

which provides guidelines regarding the implementation of the 802.11 standard's Quality of Service requirements. In accordance with this position, plaintiffs filed a motion to group the accused products according to the products' compliance with the standard and Wi-Fi specification. On September 10, 2008, I denied plaintiffs' motion, but gave plaintiffs an opportunity to file a summary judgment motion to prove that compliance with certain sections of the 802.11 standard or the Wi-Fi Multimedia Specification fall within the scope of plaintiffs' patents if they believed that such a motion would prove helpful. Dkt. #202. That motion is before the court.

Plaintiffs base their motion on the Federal Circuit's opinion in Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263 (Fed. Cir. 2004). In Dynacore, 363 F.3d at 1266-67, the plaintiff argued that computer networks conforming to certain industry standards necessarily conformed to its patent and therefore, any products that complied with the standard directly infringed its patent. Although the court of appeals affirmed the district court's decision that networks compliant with the standard did not satisfy each limitation of the patent's claims, it acknowledged that a patent may "read on" a standard, that is, that a product could not comply with a standard without practicing all the elements in the allegedly infringed patent. Id. at 1272, 1276.

Like the plaintiff in Dynacore, plaintiffs in this case contend that a product that complies with certain sections of the 802.11 standard and the Wi-Fi Multimedia

2

Specification necessarily practices certain claims in their patents.  Therefore, the issue before the court is whether compliance with these standards *requires* one to practice plaintiffs' patents.  Id. at 1276; see also U.S. Philips Corp. v. Princo Corp., 361 F. Supp. 2d 168, 179 (S.D.N.Y. 2005), *vacated and remanded on other grounds*, 173 Fed. Appx. 832 (Fed. Cir. 2006) ("It is possible to write a patent that reads so closely upon a standard that compliance with the standard would *require* one to practice the patent.  In such an instance, a party may infringe upon the patent by complying with the standard.") (Emphasis added).

Because determining whether plaintiffs' patents read on the standards requires nothing more than comparing the standards' language to the patents' claim language, there are no pertinent "facts" except for the language used in the standards and patents, which neither party disputes.  The only dispute to resolve is how the pertinent language should be interpreted.

## A.  Plaintiff Philips's '952 Patent

### 1.  Claim 1 and the 802.11 standard

Plaintiffs contend that a product practicing what the 802.11 standard refers to as "fragmentation" would necessarily have to practice "segmenting" as defined in claim 1 of the '952 patent.  Specifically, plaintiff contends that  claim 1 of the '952 patent reads on §§ 7.1.3.1.4, 7.1.3.1.5, 7.1.3.4, 7.1.3.4.1, 7.1.3.4.2 and 9.4 of the 802.11 standard because a

3

product could not comply with these sections of the 802.11 standard without practicing all the elements of claim 1 of the '952 patent.

Claim 1 of the '952 patent states:

In a data communication system wherein messages comprising data code words are to be transmitted from a data transmitter to one or more of a plurality of data receivers, a method of transmission of such messages comprising the steps of:

segmenting the data code words of each message into a sequence of successive segments each of a predetermined length;

assigning an identification number to each message and assigning sequential identification numbers to the successive segments thereof;

including in the first segment of each message a code word which contains the messages identification number and including in the last segment of each message a code word identifying it as the last segment, whereby segments having segment identification numbers between those of the first and last segments of a message are identified as being segments of such message; and

including in each segment of a message a code word which includes the segment identification number and also indicates whether such segment includes retransmissions of code words which were included in a previously transmitted segment of the same message.

'952 pat., col. 7, lns. 47-61; col. 8, lns. 1-10. The scope of the 802.11 standard "is to define one medium access control (MAC) and several physical layer (PHY) specifications of wireless connectivity for fixed, portable, and moving stations (STAs) within a local area."  IEEE 802.11-2007 Standard, dkt. #228, exh. E, § 1.1. Further, the 802.11 standard describes the requirements for the infrastructure of a basic service set.  A "basic service set" is "[a] set of

4

stations (STAs) that have successfully synchronized using the JOIN service primitives and one STA that has used the START primitive." Id. § 3.16. A "station" is "[a]ny device that contains an IEEE 802.11-conformant medium access control (MAC) and physical layer (PHY) interface to the wireless medium (WM)," id. § 3.136, including an "access point," which is "[a]ny entity that has station (STA) functionality and provides access to the distribution services, via the wireless medium (WM) for associated STAs," id. § 3.3.

The 802.11 standard's description of a basic service set for a wireless network is the description of a general data communication system. Although the standard does not refer to "data transmitters" or "data receivers," it does refer to stations, which include access points that transmit and receive data by interfacing or connecting to a wireless medium and using the wireless medium. Id. §§ 3.3 & 3.136.

## 2. Disputed elements in claim 1 and the 802.11 standard

### a. "Code word" vs. an "octet"

Plaintiffs contend that the standard's "octets" fit under the construction of "code words." I construed the term "code word," as used in claim 1 of the '952 patent, to mean "a collection of bits assembled in accordance with any code." Claim Constr. Order, dkt. #201 at 36. Defendant does not deny that an "octet" is a collection of eight bits assembled in accordance with binary code. Nonetheless, it contends that an "octet" cannot be a "code

5

word" because "binary code" does not satisfy the "any code" limitation on "code word." Defendant is wrong.

Defendant's position is that an "octet" cannot be a "code word" because it does not use a "code capable of detecting or correcting errors." Such a construction would necessarily limit code word to something less than "*any* code." I rejected any such limitation on "code word" when I construed the term. Thus, to say that binary code is not included in the "any code" limitation would contradict the claim construction. See, e.g., Trans., Claim constr. hrg., dkt. #180 at 25-26 (court asked whether the term "any code," as opposed to "a code," would include "just binary code," and plaintiffs responded, "That's correct."). Despite defendant's contention to the contrary, "any code" includes binary code and an "octet" is a "code word" as that term is used in claim 1 of the '952 patent.


b.  "Messages" vs. "medium access control service data units" and "medium access control management protocol data units"

Plaintiffs contend that the term "messages" as used in claim 1 of the '952 patent reads on the standard's "medium access control service data units" and "medium access control management protocol data units." Defendant contends that it is the "medium access control protocol data units" that correlate with "messages" in claim 1. A comparison of the claim language to the standard language establishes that plaintiffs' contention is correct.

6

According to claim 1, "messages" are made up of data code words and "the data code words of each message" are segmented into "a sequence of successive segments." '952 Pat., col. 7, lns. 47-48, 52-53.  In other words, messages are divided into segments.  According to § 9.4 of the 802.11 standard, "medium access control service data units" and "medium access control management protocol data units" can be divided into "fragments" referred to as "medium access control protocol data units."  Each "fragment" consists of "octets" and the fragment carries "all or a portion of an [sic] [medium access control service data unit] or [medium access control management protocol data unit]."

According to the standard, a "medium access control protocol data unit" is merely the term used to describe a group of "octets" that has been divided from an entire "medium access control service data unit" or "medium access control management protocol data unit." Using the terms in the '952 patent, a "medium access control protocol data unit" describes the group of "code words" that has been segmented from the larger message.  Thus, a "medium access control protocol data unit" is not the message itself, but only a fragment or segment of the larger message.

c.  "Segmenting" vs. "fragmenting"

Plaintiffs contend that the '952 patent's "segmenting the data code words of each message into a sequence of successive segments" reads on the 802.11 standard's process of

7

fragmentation, which involves "segmenting a medium access control (MAC) service data unit (MSDU) or [medium access control] management protocol data unit (MMPDU) into a sequence of smaller [medium access control] protocol data units prior to transmission." Defendant contends that segmenting is not the same process as fragmenting: under the 802.11 standard a fragment may consist of "all or a portion of" a message, whereas, under the '952 patent, a segment cannot consist of all of a message.

According to the '952 patent, the process of dividing a message's data code words into segments is particularly helpful in addressing the transmission of long messages. '952 pat., Abstract. Transmitting a long message in segments "allows the first part of a message to be delivered to its destination before the whole transaction has been completed," which means that if for some reason the transmission is interrupted, the sender need not re-transmit the entire long message. Id. col. 3, lns. 64-68; col. 4, lns. 1-2. The patent's specification also states that "[i]n the case of a short message, for example less than 30 source data code words, it may be treated as a single segment." Id. col. 2, lns. 42-44. These statements make it clear that in instances in which a message is short and there is no benefit in dividing it, a "segment" can contain the entire message. Therefore, under the '952 patent, a "segment" may consist of all or a portion of a message, just as a "fragment" under the 802.11 standard may consist of all or a portion of a message.

Next, defendant contends that fragmenting and segmenting are not the same process

8

because fragmenting does not require each fragment to be of a predetermined length, as is required of each segment. Plaintiffs contend, correctly, that satisfaction of the standard's rules regarding the length of fragments creates a predetermined length for each fragment in satisfaction of the "predetermined length" element.

With respect to the phrase "predetermined length" as used in the '952 patent, I determined in the claim construction order that the phrase does not have any special meaning and that the plain and ordinary meaning controls. Dkt. #201 at 32. Thus, there is no specific set time for determining the length of each segment and no specific method for determining the length of each segment. Section 9.4 of the 802.11 standard states

> The length of each fragment shall be an equal number of octets for all fragments except the last, which may be smaller. The length of each fragment shall always be an even number of octets, except for the last fragment of an MSDU or MMPDU, which may be either an even or an odd number of octets. The length of a fragment shall never be larger than dot11FragmentationThreshold unless WEP is invoked for the MPDU. IF WEP is active for the MPDU, then the MPDU shall be expanded by IV and ICV (see 8.2.1); this may result in a fragment larger than dot11FragmentationThreshold.
>
> . . . When data are to be transmitted, the number of octets in the fragment (before processing by the security mechanism) shall be determined by dot11FragmentationThreshold and the number of octets in the MPDU that have yet to be assigned to a fragment at the instant the fragment is construed for the first time. Once a fragment is transmitted for the first time, its frame body content and length shall be fixed until it is successfully delivered to the immediate receiving STA.

According to § 9.4's rules, the fragment size is determined before a medium access control service data unit is fragmented and the size is controlled by the size of the medium access

control service data unit and the first fragment created.  For example, if a medium access control service data unit has 113 octets, the first fragment could consist of 20 octets; each additional fragment would be required to consist of 20 octets, except for the last fragment, which would consist of 13 octets.  Therefore, the standard's rules regarding octet length provide a predetermined length for a fragment that is determined before the message is fragmented, in satisfaction of claim 1's "predetermined length" element.

3.  <u>Undisputed elements in claim 1 and the 802.11 standard</u>

a.  Identification number and sequential identification number elements of the '952 patent

Plaintiffs contend that compliance with the 802.11 standard's requirement under § 7.1.3.4.1 that "[e]ach [medium access control service data unit] or [medium access control management protocol data unit] transmitted by a STA is assigned a sequence number" satisfies the element in claim 1 of the '952 patent that a message be assigned an "identification number."  I agree.

Plaintiffs contend also that compliance with the 802.11 standard's requirement under § 7.1.3.4.2 that each fragment be assigned a fragment number, satisfies the element in claim 1 of the '952 patent that each successive segment be assigned its own identification number. Again, I agree.

10

b.  Including in the first segment of each message a code word which contains the message
identification number element of the '952 patent

Plaintiffs contend that compliance with the 802.11 standard's requirement under §

7.1.3.4.1 that "[e]ach fragment of an MSDU or MMPDU contains a copy of the sequence

number assigned to that MSDU or MMPDU," satisfies the element in claim 1 of the '952

patent that the first segment of a message contain a code word that provides the message's

identification number.  They are correct.


c.  Including in the last segment of each message a code word identifying it as the last
segment element of the '952 patent

Plaintiffs contend that compliance with the 802.11 standard's requirement under §

7.1.3.1.4 that each frame, which is the same unit as a fragment, contain a "More Fragments

field," which identifies whether the current frame is the last one of the current message,

satisfies the element in claim 1 of the '952 patent that the last segment of a message be

identified as such.  I agree.


d.  Where segments having segment identification numbers between those of the first and
last segments of a message are identified as being segments of such message element of the
'952 patent

Plaintiffs contend that compliance with the 802.11 standard's requirement under §

7.1.3.4.1 that each fragment contain a copy of the sequence number assigned to the larger

11

message, satisfies the element in claim 1 of the '952 patent that all segments between the first and last segments be identified as segments of the same larger message. I agree.

e. Including in each segment a code word that indicates whether the segment includes retransmissions of code words that were included in a previously transmitted segment of the same message element of the '952 patent

Plaintiffs contend that compliance with the 802.11 standard's requirement under § 7.1.3.1.5 that each frame contain a "Retry field," which identifies whether the current frame is a retransmission of an earlier frame, satisfies the element in claim 1 of the '952 patent that a segment indicate whether it contains any retransmitted code words. I agree.

4. Conclusion regarding claim 1 reading on the 802.11 standard

A comparison of §§ 7.1.3.1.4, 7.1.3.1.5, 7.1.3.4, 7.1.3.4.1, 7.1.3.4.2 and 9.4 of the 802.11 standard with claim 1 of the '952 patent establishes that a product's compliance with those sections of the standard requires that a product practice all elements of claim 1 of the '952 patent.

5. Claim 4 and the 802.11 standard

Claim 4 of the '952 patent is dependent from claim 1. Therefore, to practice claim 4, a product would have to comply with claim 1 and the following addition found in claim

12

4:

> transmitting a message by interleaving the bits of the data words thereof; and
> indicating in such message that the data words therein have been bit interleaved.

Col. 8, lns. 20-25.

Plaintiffs contend that a product complying with what the 802.11 standard refers to as "data interleaving" would necessarily have to practice "interleaving" as defined in claim 4 of the '952 patent. Specifically, plaintiffs contend that claim 4 of the '952 patent reads on § 17.3.5.6 of the 802.11 standard. Defendant does not deny that § 17.3.5.6 of the 802.11 standard provides for bit interleaving or that frames that are encoded using bit interleaving must provide an indicator to inform any station receiving the frame that its bits are interleaved. What defendant disputes is whether the "indicator" is located "in such message," as required by claim 4.

According to the standard, the indicator identifying whether a message's bits have been interleaved is located in the header of a physical protocol data unit, which is the type of unit to which a medium access control service data unit, that is, a message, is converted so that it can be transmitted across a radio medium. Although both sides agree that the physical protocol data unit header is separate from or not part of the original message, plaintiffs contend that the header is "an integral part of the transmission of the message." However, the claim language states that the indication is found "in such message," not that

13

such indication may be attached to the message after bit interleaving.  According to the claim language, the indicator is not a separate addition to the message but part and parcel of the message.  The 802.11 standard does not require as much.  Therefore, one can practice § 17.3.5.6 of the 802.11 standard without practicing claim 4 of the '952 patent.

3.  <u>Claim 6 and the 802.11 standard</u>

Like claim 4, claim 6 of the '952 patent is dependent from claim 1.  Claim 6 adds the following process:

> encrypting the data words of a message; and
> indicating in the message that the data words thereof have been encrypted.

Col. 8, lns. 30-34.  Plaintiffs contend that claim 6 of the '952 patent reads on §§ 7.1.3.1.8 and 8 of the 802.11 standard.  Specifically, plaintiffs contend that a product practicing any of the security measures under § 8 and including a "protected Frame field" in any frame that has been processed through such a security measure as required by § 7.1.3.1.8 necessarily practices the encrypting and encryption indicator elements of claim 6 of the '952 patent.

Defendant contends that plaintiffs should not be permitted to make a general cite to § 8, which covers 95 pages of the standard, in support of their contention that claim 6 reads on § 8.  Nonetheless, defendant does not dispute that § 8 of the 802.11 standard refers to different encryption protocols.  Because claim 6 of the '952 patent does not specify what

14

encryption protocols must be used to encrypt data words, plaintiffs' failure to discuss or cite specific encryption protocols in § 8 is immaterial.

Defendant contends further that claim 6 provides for encryption of "the data words of a message," not message segments or fragments, which the standard encrypts. However, the standard requires encryption of an entire message. If an entire message is encrypted, any segments created out of the message will necessarily be encrypted as well. Therefore, defendant's contention is unpersuasive.

I agree with plaintiffs' contentions that (1) a product practicing one of the security measures in § 8 of the 802.11 standard satisfies the element in claim 6 that the data words of a message be encrypted; and (2) a product practicing § 7.1.3.1.8 by including a "Protected Frame field" to indicate what frames have been encrypted satisfies the element in claim 6 that the message indicate that its data words have been encrypted. Therefore, a comparison of §§ 7.1.3.1.8 and 8 of the 802.11 standard with claim 6 of the '952 patent establishes that a product's compliance with those sections of the standard would require the product to practice claim 6 of the '952 patent.


B. Plaintiff LG's '993 Patent

As to the '993 patent, the question is whether a product practicing specific Quality of Service portions of the 802.11 standard or the Wi-Fi Multimedia Specification would

15

necessarily have to practice claims 25 and 26 of the '993 patent.

1. Claim 25 and the 802.11 standard and the Wi-Fi Multimedia Specification

As corrected, claim 25 of the '993 patent states

A method of controlling traffic [sic] a communication system, comprising the steps of:

setting a priority level of each of a plurality of mobile terminals; and

dynamically controlling data transmissions of each of the plurality of mobile terminals in accordance with the priority level of each mobile terminal and a congestion level of the communication system wherein each of the mobile terminals is assigned to a priority group according to the priority level of the corresponding mobile terminal, and wherein a base station dynamically controls data transmission of each of the mobile terminals by transmitting a priority group number to each of the mobile terminals indicating which groups are authorized to transmit data, and wherein mobile terminals assigned to a priority group that is not authorized to transmit are temporarily blocked from transmitting while maintaining a physical channel.

Certif. of Correction, dkt. #78, exh. 4, at 3-4. The foundation of plaintiffs' contention is that "access category," as the term is used in the 802.11 standard and the Wi-Fi Multimedia Specification, is a "priority level," as the term is used in the '993 patent. Defendant contends otherwise. I agree with defendant that an access category does not necessarily correspond to a priority level.

With immaterial differences, the 802.11 standard and Wi-Fi Multimedia Specification share the same core definition of an access category: "A label for the common

16

set of enhanced distributed channel access (EDCA) parameters that are used by a quality of service (QoS) station (STA) to contend for the channel in order to transmit medium access control (MAC) service data units (MSDUs) with certain priorities."  IEEE 802.11-2007 Standard, dkt. #228, exh. E, § 3.1; Wi-Fi Multimedia Specification, dkt. #228, exh. G, § 1.2.  Further, medium access control service data units, that is, data messages, are provided with "certain priorities" in the form of a "user priority," which is "[a] value associated with an [sic] medium access control service data unit (MSDU) that indicates how the MSDU is to be handled."  IEEE 802.11-2007 Standard § 3.168; Wi-Fi Multimedia Specification § 2.1.6.  Access categories are derived from user priorities.  IEEE 802.11-2007 Standard § 9.1.3.1; Wi-Fi Multimedia Specification § 3.3.1.  In other words, a station uses a message's user priority to determine under which access category the message should be placed.

Each message is then queued according to the access category to which it has been assigned. IEEE 802.11-2007 Standard §§ 9.1.3.1 & 9.9.1.1; Wi-Fi Multimedia Specification § 3.3.1.  The station attempts to acquire an enhanced distributed channel access transmission opportunity for the pertinent access category.  Id.  Once the opportunity is acquired, the station transmits the message queued in that access category.  Access categories containing messages with higher user priorities receive a transmission opportunity before access categories containing messages with lower user priorities.  Id.

Claim 25 of the '993 patent requires that each terminal is provided with a "priority

17

level." Certif. of Correction, dkt. #78, exh. 4, at 3-4. A terminal's priority level is used in conjunction with the overall congestion level of the communication system to "dynamically control[] data transmissions" among the terminals. Id. To control a terminal's data transmissions within the communication system, the terminal is assigned to a "priority group" based on the terminal's priority level. Id. A terminal's priority group number indicates whether a terminal is authorized to transmit data or whether it is temporarily blocked because a different group has priority. Id.

Comparing the '993 patent's language in claim 25 with the language concerning access categories in the 802.11 standard and the Wi-Fi Multimedia Specification establishes that access categories are comparable to a terminal's priority *group* number and not to its priority level. Under the '993 patent, terminals are assigned priority group numbers to specify when certain terminals are authorized to transmit data based on the priority level assigned to each terminal. Under the standard and Wi-Fi specification, stations receive access categories that they are to use to group messages with certain user priorities and that specify when the terminal may transmit the data in each access category. Assuming that a station and a terminal serve the same functions in a communication system, it is clear that the standard and Wi-Fi specification provide for a Quality of Service process that sets the priority levels of messages by assigning them user priorities and uses those *message* priority levels to group or queue messages under different priority groups, which are referred to as

18

access categories.  In other words, a product practicing either the 802.11 standard or the Wi-Fi Multimedia Specification is not required to "set[] a priority level of each of a plurality of mobile *terminals*," which is an element required by claim 25 of the '993 patent.  Therefore, a product practicing either the standard or the Wi-Fi specification would not necessarily have to practice claim 25 of the '993 patent.

2.  Claim 26 and the 802.11 standard and the Wi-Fi Multimedia Specification

Claim 26 of the '993 patent is dependent from claim 25.  Because a product practicing the 802.11 standard and the Wi-Fi Multimedia Specification would not be required to practice the elements in claim 25, it would not be required to practice all the elements in claim 26.

C.  Plaintiff Fujitsu's '642 Patent

1.  Claim 2 and the 802.11 standard

The issue for the court to decide is whether the functionality required by the 802.11 standard matches the elements of claim 2 of the '642 patent, which relates to enabling power-saving.

In pertinent part, claim 2 of the '642 patent states

A radio communications system comprising:

19

> an intermittent power-on type mobile station for shifting to a power-on state *synchronously* with a received timing of a beacon signal . . . .

Col. 26, lns. 1-4. (Emphasis added). In the September 10, 2008, claims construction order I construed "shifting to a power-on state *synchronously* with a received timing of a beacon signal" to mean "shifting to a power-on state *at the same time* a beacon signal is to be received." Dkt. #201 at 35 (emphasis added). Defendant contends that the 802.11 standard does not require synchronous shifting to a power-on state and therefore, a product that practices the standard would not necessarily practice claim 2 of the '642 patent. I agree.

Section 11.2.1.7(a) of the 802.11 standard states

> [Stations] shall wake up *early enough* to be able to receive the first Beacon frame scheduled for transmission after the time corresponding to the last TBBT plus the [station's] current ListenInterval.

(Emphasis added). Plaintiffs contend that requiring a station to "wake up early enough" is merely another way to say "shifting to a power-on state at the same time" or "synchronously" because if a station shifts to its power-on state at the same time it is to receive a beacon signal it has woken up early enough to receive the beacon signal. However, a station that shifts to its power-on state "early enough" to be able to receive a beacon signal does not necessarily make the shift at the same time, or synchronously, with the receipt of the beacon signal. A product could comply with § 11.2.1.7 of the 802.11 standard by having its station wake up or shift to a power-on state well before it is supposed to receive a beacon

20

signal.  Waking up at any time before a station receives the beacon signal would allow it to wake up "early enough" to be able to receive the beacon signal.

The "synchronous" element of claim 2 takes what § 11.2.1.7 of the 802.11 standard requires and provides a more specific application of the requirement.  Stated another way, the standard merely requires a product to power on at some time before receiving a beacon signal, whereas the '642 patent limits the power-on time to the time it is to receive the beacon signal so that the station can operate in the more efficient manner and conserve more power.  Therefore, a product that complies with § 11.2 of the 802.11 standard would not be required to practice the "synchronous" element of claim 2 of the '642 patent.


2.  Claims 6 and 8 and the 802.11 standard

Claims 6 and 8 of the '642 patent both contain the phrase "shifting to a power-on state synchronously with a received timing of a beacon signal" found in claim 2.  That same claim language in claims 2, 6 and 8 has been construed to have the same meaning:  shifting to a power-on state at the same time a beacon signal is to be received.  Dkt. #201 at 35.  Thus, as was the case with claim 2 of the '642 patent, a product that complies with § 11.2 of the 802.11 standard would not be required to practice the "synchronous" element of claims 6 and 8 of the '642 patent.

ORDER

IT IS ORDERED that

1.  The motion for partial summary judgment filed by plaintiffs Fujitsu Limited, LG Electronics Inc. and U.S. Philips Corporation, dkt. #227, is GRANTED with respect to plaintiffs' requests that the court find that

a.   A product complying with §§ 7.1.3.1.4, 7.1.3.1.5, 7.1.3.4, 7.1.3.4.1, 7.1.3.4.2 and 9.4 of the 802.11 standard necessarily complies with all elements found in claim 1 of United States Patent No. 4,975,952;

b.   A product complying with §§ 7.1.3.1.8 and 8 of the 802.11 standard necessarily complies with all elements found in claim 6 of United States Patent No. 4,975,952.

2.  The motion, dkt. #227, is DENIED with respect to plaintiffs' requests that the court find that

a.   A product complying with § 17.3.5.6 of the 802.11 standard necessarily complies with all elements found in claim 4 of United States Patent No. 4,975,952;

b.   A product complying with §§ 3.150, 3.152, 3.168, 5.1.1.4, 6.1.5, 7.1.3.5 and 9.1.3.1 of the 802.11 standard or §§ 2.1.6, 3.3, the Wi-Fi Multimedia Specification necessarily complies with all elements found in claims 25 and 26 of United States Patent No. 6,469,993; and

22

      c.   A product complying with § 11.2 of the 802.11 standard necessarily complies with all elements found in claims 2, 6 and 8 of United States Patent No. 6,018,642.

      Entered this 5th day of January, 2009.

                BY THE COURT:

                /s/

                _____

                BARBARA B. CRABB
                District Judge